Slip Op. 19-29

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| STEIN INDUSTRIES INC., D/B/A CARLSON AIRFLO MERCHANDISING SYSTEMS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Before: Mark A. Barnett, Judge<br>Court No. 18-00150 |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's scope determination for reconsideration.]

Dated: March 5, 2019

Richard P. Ferrin, Drinker Biddle & Reath LLP, of Washington, DC, argued for Plaintiff. With him on the brief were Douglas J. Heffner and Lukose J. Karamyalil.

Jessica L. Cole, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director.  Of counsel on the brief was Caroline D. Bisk, Attorney, U.S. Department of Commerce, of Washington, DC.

Barnett, Judge:  This action involves a challenge to a U.S. Department of Commerce ("Commerce" or "the agency") scope determination for the antidumping and countervailing duty orders on light-walled rectangular ("LWR") pipe and tube from the People's Republic of China ("the PRC" or "China").  See Compl., ECF No. 5; Final

Scope Ruling on the Antidumping and Countervailing Duty Orders on Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Carlson AirFlo Merchandising Systems Scope Ruling Req., A-570-914, A-570-915, A-583-803 (May 29, 2018) ("Final Scope Ruling"), ECF No. 12-4; *Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea*, 73 Fed. Reg. 45,403 (Dep't Commerce Aug. 5, 2008) (antidumping duty orders and notice of am. final determination of sales at less than fair value with respect to the Republic of Korea) ("*AD Order*"); *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 45,405 (Dep't Commerce Aug. 5, 2008) (notice of countervailing duty order) ("*CVD Order*") (together, "the *Orders*").[1]

Plaintiff, Stein Industries Inc., d/b/a Carlson AirFlo Merchandising Systems ("Plaintiff" or "Carlson"), challenges Commerce's determination that its merchandising bar and adjustable welded mounted bar kit are each within the scope of the *Orders*. *See* Mot. of Pl. Stein Industries Inc. for J. on the Agency R., ECF No. 18, and Confidential Mem. of P. & A. of Pl. Stein Industries Inc., d/b/a Carlson Airflo Merchandising Systems in Supp. of its Mot. for J. on the Agency R. ("Pl.'s Mem."), ECF No. 20; Reply Br. of Pl. Stein Industries Inc., d/b/a Carlson Airflo Merchandising Systems ("Pl.'s Reply"), ECF No. 23.  Defendant United States ("the Government")

---

[1] The administrative record filed in connection with the Final Scope Ruling is divided into a Public Administrative Record ("PR"), ECF No. 12-2, and a Confidential Administrative Record ("CR"), ECF No. 12-1.  Parties submitted joint appendices containing record documents cited in their Rule 56.2 briefs. *See* Public J.A. ("PJA"), ECF No. 25; Confidential J.A. ("CJA"), ECF No. 26.  The court references the confidential versions of the relevant record documents, unless otherwise specified.

urges the court to sustain Commerce's scope determination.  *See* Def.'s Resp. to Pl.'s

Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 22.  For the reasons

discussed herein, the court remands the Final Scope Ruling.

**BACKGROUND**

## I.    Legal Framework for Scope Determinations

Because descriptions of merchandise contained in the scope of an antidumping

or countervailing duty order must be written in general terms, issues may arise as to

whether a particular product is included within the scope of such an order.  *See* 19

C.F.R. § 351.225(a).  When those issues arise, Commerce's regulations direct it to

issue "scope rulings" that clarify whether the contested product falls within the purview

of an antidumping or countervailing duty order's scope.  *Id*.  Although there are no

specific statutory provisions that govern the interpretation of the scope of an order, the

determination of whether a product is included within the scope of an order is governed

by case law and the regulations published at 19 C.F.R. § 351.225.  *Meridian Prods.,*

*LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citation omitted); *see also*

*Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071-72 (Fed. Cir. 2001) (noting

that 19 C.F.R. § 351.225 provides the process for determining whether an antidumping

duty order covers a product).[2]

---

[2] The regulations establish a two-step process, and "case law has added another layer to the inquiry."  *Meridian Prods.*, 851 F.3d at 1381 (distinguishing between Commerce's examination of the "text of an order's scope" and the sources enumerated in 19 C.F.R. § 351.225(k)(1), discussed herein).

Commerce's inquiry must begin with the relevant scope language.  *See, e.g.,*

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (explaining

that the language in the order is the "predicate for the interpretive process" and the

"cornerstone" of a scope analysis").  If the language is ambiguous, Commerce interprets

the scope "with the aid of" the sources set forth in 19 C.F.R. § 351.225(k).  *Meridian*

*Prods.*, 851 F.3d at 1381 (quoting *Duferco Steel*, 296 F.3d at 1097).

Specifically, Commerce first considers the description of the merchandise in the

petition and initial investigation, and prior determinations by Commerce (including scope

determinations) and the International Trade Commission ("ITC").  *See Meridian Prods.*,

851 F.3d at 1382 (citing 19 C.F.R. § 351.225(k)(1) (the "(k)(1) factors")).  If the (k)(1)

factors are dispositive, Commerce issues a final scope ruling. *See* 19 C.F.R.

§ 351.225(d).[3]  When the (k)(1) factors are not dispositive, Commerce considers the

sources in subsection (k)(2) of the regulation.  *See* 19 C.F.R. § 351.225(k)(2).[4]

"Commerce is entitled to substantial deference with regard to its interpretations of

its own antidumping duty orders." *King Supply Co., LLC v. United States*, 674 F.3d

1343, 1348 (Fed. Cir. 2012).  Nevertheless, "Commerce cannot interpret an

antidumping order so as to change the scope of th[e] order, nor can Commerce interpret

---

[3] To be dispositive, the (k)(1) factors "must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question." *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).
[4] Specifically, Commerce will consider: "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2) (the "(k)(2) factors").

an order in a manner contrary to its terms." *Eckstrom Indus.*, 254 F.3d at 1072 (internal

quotation marks and citation omitted).  When a party challenges a scope determination,

the court's objective is to determine whether the scope of the order "contain[s] language

that specifically includes the subject merchandise or may be reasonably interpreted to

include it." *Duferco Steel*, 296 F.3d at 1089.

## II.    Administrative Proceedings and Procedural Background

On August 5, 2008, Commerce published antidumping and countervailing duty

orders on LWR pipe and tube from China.  *See AD Order*, 73 Fed. Reg. at 45,403; *CVD

Order*, 73 Fed. Reg. at 45,405.  The *Orders* contain effectively identical scope language

describing subject merchandise, *inter alia*, as "certain welded carbon quality light-walled

steel pipe and tube, of rectangular (including square) cross section . . ., having a wall

thickness of less than 4 mm." *AD Order*, 73 Fed. Reg. at 45,404; *see also CVD Order*,

73 Fed. Reg. at 45,405.  The *Orders* further note that "[t]he welded carbon-quality

rectangular pipe and tube subject to these orders is currently classified under the

Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.61.50.00

and 7306.61.70.60." *AD Order*, 73 Fed. Reg. at 45,404; *CVD Order*, 73 Fed. Reg. at

45,406.  Commerce provided the tariff provisions "for convenience and Customs

purposes" only; the "written description of the scope of these orders is dispositive." *AD

Order*, 73 Fed. Reg. at 45,404; *CVD Order*, 73 Fed. Reg. at 45,406.

On December 11, 2017, Carlson requested a scope ruling to determine whether

four of its products imported from China were outside the scope of the *Orders*.  *See

Scope Req. of Carlson AirFlo Regarding Certain Finished Components of Refrigerated

Merchandising and Display Structures (Dec. 11, 2017) ("Scope Req."), CR 1, PR 1, CJA

Tab 1, PJA Tab 1.  On January 24, 2018, Commerce issued Carlson a supplemental

questionnaire requesting additional information about the products.  *See* Suppl.

Questionnaire (Jan. 24, 2018), PR 2, PJA Tab 3.  Carlson responded on April 11, 2018.

*See* Am. Scope Req. of Carlson AirFlo Regarding Certain Finished Components of

Refrigerated Merchandising and Display Structures (Apr. 11, 2018) ("Suppl. Scope

Req."), CR 2-4, PR 8-9, CJA Tab 2, PJA Tab 4.[5]

Carlson characterized the products at issue as "certain finished components of

refrigerated merchandising and display structures."  Scope Req. at 1; Suppl. Scope

Req. at 1.  Carlson asserted that all four products were properly classified pursuant to

HTSUS subheading 9403.90.80.41.[6]  *See* Suppl. Scope Req. at 7.  Carlson described

each product as follows:

1. Part No. R10447, which consists of a "merchandising bar" made of 1.50

   millimeter ("mm") thick 16-gauge carbon steel that is "formed and welded into a

   hollow rectangular shape."  Scope Req. at 2; *see also id.*, Ex. 3.  Before

---

[5] Carlson initially requested a scope ruling with respect to antidumping and
countervailing duty orders on LWR pipe and tube imported from China and Taiwan.
*See* Final Scope Ruling at 2.  Carlson later clarified that the products at issue are
manufactured in and imported from China.  *See id.*  Thus, Commerce's scope
determination applies to the published orders on LWR pipe and tube from China only.
*See id.*
[6] Carlson initially asserted that all four products are properly classified pursuant to
subheading 8302.50.00.00 of the HTSUS.  *See* Scope Req. at 5.  Carlson later
amended its position.  *See* Suppl. Scope Req. at 7.  Subheading 9403.90.80.41 covers
"Other furniture and parts thereof: Parts: Other[:] Other," with a corresponding duty rate
of zero.

importation, "[t]wo tubes are welded on the top of the bar, in order to prevent the frame from sliding too much to either the right or left side inside the case."  *Id.* at 3.  The tubes "are also made of carbon steel, 0.5 inch x 1.5 inch x 0.5 inch."  *Id.*

2.  Part No. P0228321, which consists of a "universal mounting bar" made of 1.50 mm thick 16-gauge carbon steel that is "formed and welded into a hollow rectangular shape."  *Id*. at 3.  "Numerous holes are drilled into [the mounting bar]" before importation.  *Id.* at 3-4.  The mounting bar "is imported separately as a component of kit part number 250211," which "is assembled after importation."  *Id.* at 4.

3.  Kit No. 250172, which consists of a "rear hang cantilever component kit" containing a mounting bar, brackets, and hex wrench.  *Id*. at 4-5.  The mounting bar consists of 1.50 mm thick 16-gauge carbon steel that is "formed and welded into a hollow rectangular shape."  *Id.* at 4.  Following importation, "the brackets and the bar are screwed together[] with the enclosed hex wrench."  *Id.*

4.  Kit No. 250355, which consists of an "adjustable welded mounting bar kit" containing "a one-piece welded adjustable insert."  *Id*. at 5.  The insert, Part No. P01793, consists of 0.12-inch-thick 11-gauge carbon steel that is "formed and welded into a hollow rectangular shape."  *Id.*  Before importation, "[t]wo pieces of custom-cut cold-rolled steel . . . are punched and welded to the bar."  *Id.*

Carlson asserted several arguments before Commerce supporting the exclusion of its products from the scope of the *Orders*.  *See id*. at 9-17; Suppl. Scope Req. at 3-6, 9-12.  Carlson argued that the plain language of the scope does not include "finished

components [of] refrigerated merchandising and display structures." Scope Req. at 9.

Carlson acknowledged that its products contain "structural steel bars" as inputs that

would be covered by the scope; according to Carlson, however, the imported products

are not LWR pipes or tubes but instead are "finished downstream components made

from LWR pipes or tubes." *Id.* Carlson noted that all four products are powder coated

and perforated. Suppl. Scope Req. at 9-10, 11-12. Perforation of the bars "in particular

places . . . and with particular drill hole shapes dedicates the part for a specific use," i.e.,

"refrigerated merchandising and display structures." *Id*. at 12. Additionally, Carlson

noted that alterations to three of its products resulted in the lack of a uniform square or

rectangular cross-section. Scope Req. at 13-14. Relevant thereto, Carlson pointed to

pre-importation alterations to the merchandising bar (Part No. R10447) and adjustable

welded mounting bar kit (Kit No. 250355) and post-importation assembly of the rear

hang cantilever component kit (Kit No. 250172). *Id.*; *see also* Suppl. Scope Req. at 3,

5, 6.

Carlson further argued that consideration of the (k)(1) factors favored exclusion.

Scope Req. at 10. According to Carlson, the underlying petition and ITC investigative

reports indicate that subject LWR pipe and tube is an "intermediate product" used to

make various downstream products, such as store shelving, which are not included in

the scope. *Id*. at 10-12. Carlson also argued that consideration of the (k)(2) factors

favored excluding all four products from the scope. *Id*. at 14-17. No other interested

party commented on Carlson's scope ruling request. Final Scope Ruling at 7.

On May 29, 2018, Commerce issued its scope determination pursuant to 19

C.F.R. § 351.225(k)(1) without initiating a formal scope inquiry or considering the (k)(2)

factors.  *See* Final Scope Ruling at 7.  In its ruling, Commerce determined that all four of

Carlson's products were subject to the *Orders*.  *See id.* at 7-10.

Specifically, Commerce concluded that "all four parts in their original form" are

described by the scope language regarding steel type (carbon or carbon-quality) and

wall thickness (less than 4 mm).  *Id.* at 7.  Commerce rejected Carlson's argument that

pre-importation processing removes the products from the scope of the *Orders*,

asserting that "[p]roducts that meet the description of subject merchandise in the scope

are covered unless explicitly excluded from the scope," and the relevant scope did not

contain exclusionary language.  *Id.* at 7-8; *see also id.* at 8 ("[T]he scope of the *Orders*

does not limit coverage based on whether the products have undergone certain further

processing, such as perforation, either before importation or after importation.").

According to Commerce, "it is not reasonable to conclude that simply because a

particular type of LWR pipe and tube is not specifically mentioned in the scope, that

product is not covered."  *Id.* at 8.

Commerce further rejected Carlson's argument that its products are outside the

scope "because they may be used, or are intended to be used, in 'certain finished

components of refrigerated merchandising and display structures.'"  *Id.*  Pointing to *King

Supply Co. v. United States*. 674 F.3d 1343, 1349 (Fed. Cir. 2012), Commerce asserted

that end-use restrictions must be clearly stated, and the scope language at issue does

not "exclud[e] LWR pipe and tube based on end use."  *Id.* at 8 & n.60.

Lastly, Commerce concluded that an analysis of the (k)(1) factors does not support excluding Carlson's products. *Id.* at 9. Commerce explained that the petition does not contain "specific requirements . . . regarding Carlson['s . . .] proposed exclusions," and the underlying Commerce and ITC investigations do "not provide any guidance as to the imposition of any surface-treatment, length, specification, or end-use requirements." *Id.* In sum, Commerce determined that Carlson's "perforated tubes . . . are within the scope of the *Orders.*" *Id.* at 10.

Plaintiff now challenges Commerce's determination with respect to the merchandising bar and adjustable welded mounting bar kit (Part No. R10447 and Kit No. 250355, respectively). *See, e.g.*, Pl.'s Mem. at 13-21. Plaintiff's motion for judgment on the agency record pursuant to U.S. Court of International Trade Rule 56.2 is fully briefed, and the court heard oral argument on February 20, 2019. *See* Docket Entry, ECF No. 28.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi)(2012),[7] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[7] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code and all citations to the U.S. code are to the 2012 edition, unless otherwise specified.

## DISCUSSION

### I.   Parties' Contentions

Plaintiff contends that the merchandising bar and adjustable welded mounting

bar kit are not subject to the *Orders* based on the plain language of the scope.  Pl.'s

Mem. at 13.  Plaintiff asserts that subject merchandise must "uniformly" exhibit a

rectangular (or square) cross-section, and its merchandising bar and adjustable welded

mounting bar kit have welded attachments that negate uniformity of cross-section.  *Id*. at

13-16.  Specifically, the merchandising bar does not exhibit a rectangular cross-section

at the location of the tubes welded thereto, *id.* at 14-15, and the bar component of the

adjustable welded mounting bar kit has custom-cut cold-rolled steel pieces welded to

each end such that the bar lacks "two parallel sides from end to end," *id.* at 15.

According to Plaintiff, Commerce failed to address whether the lack of a uniform cross-

section removed the merchandising bar and adjustable welded mounting bar kit from

the scope of the *Orders*, and instead conflated this argument with Plaintiff's separate

argument that perforation transforms an LWR pipe or tube "into a down-stream out-of-

scope product."  *Id.* at 16-17; Pl.'s Reply at 11-12.  Plaintiff asserts that Commerce's

failure to address this argument is "clear error that independently warrants a remand."

Pl.'s Reply at 13.

Plaintiff also contends that consideration of the (k)(1) factors favors excluding the

merchandising bar and adjustable welded mounting bar kit from the scope.  Pl.'s Mem.

at 17.  Plaintiff notes that illustrations in an ITC report regarding the types of LWR pipes

and tubes subject to the *Orders* reflect products with uniform cross-sections, and the

ITC described subject merchandise as "an *intermediate product*" used for downstream

purposes, such as display shelving.  *Id.* at 18; *see also id.* at 19-20 (listing downstream

products utilizing LWR pipe or tube cited by the ITC).  According to Plaintiff, the ITC's

description "simply makes no sense if . . . the ITC considered all of the downstream

products *made from* LWR pipe or tube to still be considered LWR pipe and tube within

the scope of the investigation."  *Id.* at 19.  Plaintiff further asserts that the underlying

petition likewise indicates that LWR pipes and tubes are intermediate products that are

distinct from the downstream products into which they are manufactured.  *Id.* at 20-21.

Defendant contends that Carlson's merchandising bar and adjustable welded

mounting bar are covered by the plain language of the scope, which does not clearly

exclude products that have undergone further processing.  Def.'s Resp. at 12.

Defendant asserts that interpreting the scope to require a uniform cross-section, as

argued by Plaintiff, "impermissibly changes the scope of the *Orders*."  *Id.* at 13.  Rather,

according to Defendant, the scope merely requires products to form a rectangular

cross-section "in most parts," and Carlson's products meet this requirement.  *Id.* at 13-

14.  Defendant also asserts that Commerce considered Carlson's argument regarding

the need for a uniform cross-section "jointly" with Carlson's arguments regarding other

types of further processing or end-use, *id.* at 15, and Commerce's "path [to its

determination] may be reasonably discerned," *id.* (quoting *Bowman Transp., Inc. v.

Ark.–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).

Defendant further contends that the (k)(1) factors support Commerce's

determination.  *Id.* at 15.  According to Defendant, "the variety of uses to which LWR

pipe and tube is put" suggests that "many importers would further process this product by adding items such as brackets," and "[i]t would make little sense for the petition to describe" the various applications in which LWR pipe and tube is used "if the petitioners only intended for LWR pipe and tube to be covered when imported in its original form." *Id.* at 16. Defendant also asserts that the ITC's reference to LWR pipe and tube's use in "store display shelves and racks" does not mean that "display shelf components are excluded," *id.*; "end-use . . . is only relevant [when] there is clear exclusionary language," and there is none here, *id.* at 17 (citing *King Supply*, 674 F.3d at 1349). According to Defendant, "even if the ITC report could be properly read to exclude downstream, end-use products, Carlson's merchandise would still fall within the scope [because] *they are still intermediate products at the time of importation*." *Id.*

## II.   Commerce's Scope Ruling is Remanded for Reconsideration

The scope at issue covers, *inter alia*, "certain welded carbon quality light-walled steel pipe and tube" with a "rectangular (including square) cross-section." *AD Order*, 73 Fed. Reg. at 45,404; *CVD Order*, 73 Fed. Reg. at 45,405. From the outset, remand is required for Commerce to address Carlson's argument that the merchandising bar and adjustable welded mounting bar kit are outside of the scope based on the lack of a uniform cross-section. Although Commerce is correct that "[p]roducts that meet the description of subject merchandise in the scope are covered unless explicitly excluded from the scope," Final Scope Ruling at 7-8, Commerce incorrectly assumed that Carlson's products met the description of subject merchandise and then proceeded to consider whether the scope contained exclusionary language based on further

processing or end use, *see id.* at 8 ("[A]ny exclusion *for [Carlson's] LWR pipes and tubes* would have to be clearly articulated.") (emphasis added).  Commerce, thus, did not consider the correct question: *Do Carlson's merchandising bar and adjustable welded mounting bar kit products, as imported, meet the description of the scope notwithstanding their lack of a uniform cross-section*?  Without more, the court cannot ensure that Commerce has not interpreted the scope of the *Orders* "in a manner contrary to its terms."  *Eckstrom Indus.*, 254 F.3d at 1072.

Defendant's assertion that Commerce's consideration of this argument and rationale for dismissing it are discernable is not persuasive.  Commerce's statement that "the scope of the *Orders* does not limit coverage based on whether products have undergone further processing, *such as perforation*, either before importation or after importation," Final Scope Ruling at 8 (emphasis added), provides no indication that Commerce considered the extent to which products must exhibit a rectangular or square cross-section in order to be covered by the plain language of the scope.  This is a distinct issue that is not encompassed by Commerce's consideration of the degree to which products may be further processed while still being in scope.  Defendant's assertion that the scope requires products to exhibit a rectangular cross-section "in most parts" is simply a *post hoc* attempt to interpret the scope language, using language that does not appear in the scope, which is impermissible.[8]  *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69 (1962).

---

[8] Defendant grounds its assertion in the scope's lack of an explicit reference to the need for a uniform cross-section.  *See* Def.'s Resp. at 13 ("If Commerce intended for the

Commerce further erred in its analysis of Carlson's argument that the scope does

not cover downstream products made with subject LWR pipes or tubes.  Commerce

asserted that Carlson's products are not "outside of the scope of the *Orders* because

they may be used, or are intended to be used, in 'certain finished components of

refrigerated merchandising and display structures.'"  Final Scope Ruling at 8.  Carlson

argued, however, that its products *are* "certain finished components of refrigerated

merchandising and display structures," Scope Req. at 1, and, thus, consisted of

"*downstream products* dedicated to particular uses as components of refrigerated

merchandising and display structures," Suppl. Scope Req. at 9 (emphasis added).

Carlson did not argue that its products are outside of the scope based on their end-use.

*See* Pl.'s Reply at 9.  For that reason, Commerce's—and, by extension, the

Government's—reliance on the U.S. Court of Appeals for the Federal Circuit's holding

---

*Orders* to cover only those LWR pipes and tubes with a uniform-cross-section, it would
have specified this.  Because Commerce did not, the logical reading of the *Orders*'
scope is that covered products must only form a rectangle in most parts.").
Preliminarily, when scope language is ambiguous, the law requires Commerce to
interpret the language using the sources set forth in 19 C.F.R. § 351.225(k).  *See*
*Meridian Prods.*, 851 F.3d at 1381.  It is not the Government's role—in litigation—to
interpret ambiguous scope language in the first instance.  Moreover, although
Commerce did not explicitly include a uniform cross-section requirement, it did provide
for a "rectangular (including square) cross section."  *See, e.g.*, *AD Order*, 73 Fed. Reg.
at 45,404.  The court notes that the HTSUS subheadings referenced in the scope
language are contained in Chapter 73 of the HTSUS.  As Plaintiff points out, the
Explanatory Notes to Chapter 73 describe "tubes and pipes," as, *inter alia*, "[c]oncentric
hollow products, of *uniform cross-section*."  World Customs Organization, Harmonized
Commodity Description and Coding System, Explanatory Notes 4th Ed. (2007), Ch. 73;
*see also* Pl.'s Reply at 6.  Thus, Commerce's inclusion of Chapter 73 tariff provisions,
even if provided for convenience and, thus, not dispositive, undermines Defendant's
argument that Commerce did not intend for covered products to have a uniform cross-
section.

that "end-use restrictions do not apply to [antidumping duty orders] unless the [] order at issue includes clear exclusionary language" is unavailing.  Final Scope Ruling at 8 & n.60 (quoting *King Supply*, 674 F.3d at 1349); Def.'s Resp. at 12 (same).[9]

Commerce's conclusory assessment of the (k)(1) factors does not save its determination.  The agency's conclusion that the sources referenced therein do "not provide guidance as to the imposition of any surface treatment, length, specification, or end-use requirements on the products within the scope of the *Orders*," Final Scope Ruling at 9, failed to address Carlson's argument that the (k)(1) sources distinguish between subject LWR pipes and tubes and out-of-scope downstream products, such as store shelving, made from LWR pipes or tubes, *see* Scope Req. at 10-12.  Defendant's assertion that the petitioners' listing of potential end-uses reflects an intention to include downstream products, *see* Def.'s Resp. at 16, is speculative, at best.  Defendant's analysis of the ITC reports also lacks merit.  Defendant asserts that the ITC sources support the inclusion of intermediate *and* downstream products in the scope.  *See id.* at 16-17.  That assertion is difficult to reconcile with the ITC's description of LWR pipe and

---

[9] The scope at issue in *King Supply* covered "carbon steel butt-weld pipe fittings . . . *used to* join sections in piping systems where conditions require permanent, welded connections."  674 F.3d at 1346 (citation omitted) (emphasis added).  The plaintiff argued that its butt-weld pipe fittings were excluded from the scope because they were used for purposes other than those stated in the scope.  *Id.* at 1347 (citation omitted).  The court held that the plaintiff's products, which met the physical description of the products covered by the order, were in scope regardless of their use because the uses stated in the scope were merely exemplary.  *Id.* at 1349-50.  This case is distinct from *King Supply* because, here, the issue is whether Carlson's further manufactured products continue to meet the physical description of the products described by the scope, not whether they are excluded based on their use.

tube—the subject merchandise—as an intermediate product, and the ITC's inclusion of

pictures of LWR pipes and tubes reflecting uniform cross-sections devoid of further

processing or attachments.  *See* Scope Req. at 11-12.  The ITC's discussion of the

types of end-use products in which LWR pipe and tube is used is not reasonably read to

suggest that all LWR pipe and tube further manufactured for one of the identified uses

remains within the scope no matter the downstream product's shape or the degree of

further manufacturing.

For the reasons stated above, Commerce's scope determination is remanded for

reconsideration.

CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Final Scope Ruling is remanded to the agency for

further consideration in accordance with the terms of this opinion; and it is further

**ORDERED** that the agency shall file its redetermination on remand on or

before June 3, 2019; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 6,000

words.

/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: March 5, 2019
       New York, New York